Entered: July 31, 2006
Signed: July 30, 2006
**SO ORDERED**



NANCY V. ALQUIST
U. S. BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| In re: | * | |
| JANET MAE RIGGS, | * | Case No. 04-21559-WIL |
| | | (Chapter 13) |
| Debtor. | * | |
| * * * * * * * | * * * * * | |
| JANET MAE RIGGS, | * | |
| Plaintiff, | * | |
| v. | * | Adv. No. 04-01941-WIL |
| KAREN ROLLINGS, | * | |
| Defendant. | * | |
| * * * * * * * * * * * * * | | |

### MEMORANDUM OF DECISION IN SUPPORT OF ORDER GRANTING MOTION [17] TO ENFORCE AND APPROVE SETTLEMENT AGREEMENT

Before the Court are the Motion of Karen Rollings (the "Defendant" or "Ms. Rollings") to Enforce and Approve Settlement Agreement and for Other Relief [17], filed on March 7, 2005 (the "Motion"), and the Response thereto (the "Response") [19], filed by Janet Mae Riggs (the "Plaintiff" or "Ms. Riggs") on March 28, 2005. Hearings on this matter were held on August 5, 2005 and August 8, 2005. The Court heard testimony of Robert Haeger, Esq., counsel for Ms.

Riggs ("Mr. Haeger") and Jeffrey Larson, Esq., counsel for Ms. Rollings ("Mr. Larson"), and admitted the parties' exhibits.[1]

The Court has heard the evidence, reviewed the exhibits, considered the materials submitted by the parties and has had the benefit of argument of counsel. The Court now issues this Memorandum of Decision of its findings of fact and conclusions of law in support of its Order Granting Motion to Enforce and Approve Settlement Agreement, which Order will be entered in conjunction with this Memorandum of Decision.

**I.    FACTS**

    **A.    The Property Transaction**

Ms. Riggs was in financial trouble before she filed her voluntary petition under the Bankruptcy Code. In 2003, she was on the brink of losing her home to foreclosure when she contacted Ms. Rollings, a Re/Max agent, in response to a Re/Max flyer she received in the mail.

On December 4, 2003, Ms. Riggs and Ms. Rollings entered into an agreement wherein Ms. Rollings would purchase from Ms. Riggs certain real estate located at 446 Girard Street, No. 313, Gaithersburg, Maryland 20877 (the "Property"). Ms. Rollings agreed to pay the amount of $76,584.92 (subject to adjustments at closing). This amount was sufficient to pay off two mortgages, the arrearage in condominium fees, and expenses incurred by one of the lenders in connection with the foreclosure. Ms. Riggs agreed to pay rent to Ms. Rollings in the amount of $900.00 per month. The parties also agreed that Ms. Riggs could buy the Property back during the next six months for $18,000 plus the purchase price, and after six months, at fair market value. Ms. Riggs further agreed that if she had not repurchased the Property within six

---

[1] Ms. Riggs' exhibits numbered 3, 4, 7, 10, 11, and 14 through 18 were admitted subject to this Court's later determination of relevance. The Court finds that they are relevant and are considered herein.

months, she would immediately move out. Ms. Riggs signed a Deed on December 5, 2003, conveying the Property to Ms. Rollings. Thereafter, Ms. Riggs did not pay rent as agreed, did not repurchase the Property and did not move out.

### B.      The Motion for Relief from Stay and Adequate Protection Ruling

On May 10, 2004, Ms. Riggs filed a voluntary petition under chapter 13 of the Bankruptcy Code. On June 17, 2004, Ms. Rollings filed a proof of claim in the amount of $4,500.00 for unpaid rent for the period January 2004 through May 2004 (Claim No. 5). On July 8, 2004, Ms. Rollings filed a Motion for Relief from Automatic Stay [18] (the "Lift Stay Motion"), seeking permission from this Court to pursue in state court an action for non-payment of rent from January 2004 through July 2004. On July 28, 2004, Ms. Riggs filed a Response [20] to the Lift Stay Motion. She asserted that the Deed was invalid, that the conveyance of the Property was fraudulent because Ms. Rollings and Re/Max "stole" it from her, and that she is the rightful owner and therefore owes no rent. On July 29, 2004, Ms. Riggs commenced the instant adversary proceeding against Ms. Rollings by filing an Objection to Claim and Counterclaim for Rescission or Damages [1]. In this paper, Ms. Riggs made many of the same allegations of wrongdoing on Ms. Rollings' part as she had made in her Response to the Lift Stay Motion.

A hearing on the Lift Stay Motion and Response was held on July 30, 2004 before the Honorable Duncan W. Keir of this Court, who was the Judge to whom this case was then pending. The Court granted relief from the automatic stay and entered an Order granting the Lift Stay Motion on August 6, 2004 [28]. On August 16, 2004, the Debtor filed a Motion to Alter or Amend Order [31], asking the Court to reconsider its Order lifting the stay. On September 17, 2004, the Court (still Judge Keir presiding) held a hearing on the matter and ruled as follows:

> "... the Court will grant the motion to reconsider and the order previously entered in the action of the motion for relief from stay will be vacated and replaced by an adequate protection order, which I am about to set forth on the record. The automatic stay shall continue in effect, and prevent the enforcement of rights by the respondent here today, provided that the Debtor shall, commencing on the first day of October, pay the sum of $300 in good funds to the Respondent, and on the first day of November the same amount. Thereafter, on the first day of every month, until the matter is finally adjudicated as to the title, the Debtor shall pay the sum of $900 per month."

*See* Defendant's Exhibit 1, Transcript of Hearing of September 17, 2004, pp. 17-18.

On the same date, the Court also continued the pretrial conference scheduled for a few days later in the adversary proceeding, and instructed the parties to meet and submit a joint discovery schedule. Ms. Riggs, Mr. Haeger, Ms. Rollings and Mr. Larson then left the courtroom and met in the hallway. During that meeting, Mr. Haeger and Mr. Larson began a dialogue on the subject of settlement that would lead to the instant Motion to enforce settlement.

C.  **Settlement Negotiations**

On September 17, 2004, in the hallway outside Judge Keir's courtroom, Mr. Larson and Mr. Haeger began discussing settlement of the pending litigation. Both Mr. Larson and Mr. Haeger testified about these discussions and what transpired. The parties testified that Ms. Riggs and Ms. Rollings were present when their attorneys met in the hallway. The only record that appears to have been made of the agreement consists of Mr. Larson's handwritten notes dated September 17, 2004. Mr. Haeger testified at the August 5, 2005 hearing that he took no notes that day and that he routinely takes no notes while "standing." According to Mr. Larson's notes, the terms of the settlement were as follows:

> "(1) $35,000
>  (2) 1/2 up front
>  (3) 60 days to vacate (11/17)
>  (4) confidentiality agreement

4

        (5) release
        (6) stay remains in effect"

*See* Plaintiff's Exhibit 1.

Mr. Haeger also testified at the August 5, 2005 hearing that he agreed to prepare the written settlement agreement. On September 30, 2004, he sent the proposed agreement to Mr. Larson for review and approval (the "September Version"). *See* Plaintiff's Exhibit 2. The September Version embodies the six terms listed in Mr. Larson's notes and adds a few items not contained on the list, including: (1) a waiver by the Defendant of the adequate protection payments awarded to her by the Court at the hearing on September 17, 2004; (2) a choice of law provision stating that Maryland law would govern the agreement; (3) a statement that the parties had the authority to execute the agreement; and (4) a statement that the agreement was subject to approval of the Bankruptcy Court.

On October 4, 2004, four days after Mr. Haeger drafted the September Version and sent it to Mr. Larson for review, Ms. Riggs wrote to an individual named Mr. Jesperson, identified by the parties as a Re/Max representative, and accused Ms. Rollings of the following conduct:

> "[U]sing your good name as a front in a shady operation of preying on people who are financially vulnerable... I unknowingly sold my condo to her, thinking that I was turning it over to Remax... To use Remax this way is appauling [sic], not to mention non-businesslike... Cheating people is wrong, and to have someone like this in your company will not be good for your reputation in the long run. Please contact my lawyer for further information."

*See* Plaintiff's Exhibit 3.

On October 8, 2004, Ms. Rollings refinanced her outstanding debt on the Property. *See*

Plaintiff's Exhibit 4, HUD-1 Settlement Statement.[2]

On November 2, 2004, Mr. Larson sent revisions to Mr. Haeger for review (the "November Version"). The November Version differed from the September Version in several respects: (1) Re/Max and Home Settlement Centre were added as parties to the settlement; (2) the waiver of adequate protection payments was deleted; (3) the deadline for Ms. Riggs to vacate the Property was changed to November 30, 2004; (4) a provision that Ms. Riggs would relinquish forever any claims to ownership of the Property was added; (5) a provision that the parties would not disparage or damage the personal or business reputation of any other party was added; and (6) a separate document entitled "Release Settlement in Full of All Claims" was attached. *See* Plaintiff's Exhibit 6.

On November 17, 2004, Ms. Riggs contacted the Better Business Bureau of Metro Washington D.C. and Eastern Pennsylvania (the "BBB"). Ms. Rollings then received a letter from the BBB informing her that a complaint had been made by one of her customers and that a response was requested within the next ten days. *See* Plaintiff's Exhibit 7.

On November 22, 2004, having received no response to the November Version, Mr. Larson sent Mr. Haeger a letter demanding an answer within the next two days or he would withdraw the agreement. *See* Plaintiff's Exhibit 8. As Mr. Larson testified at the August 5, 2005 hearing, the purpose of this letter was to force Mr. Haeger to finish the deal. Apparently, it worked. Mr. Haeger responded on November 24, 2004. Among other things, he informed Mr.

---

[2] Ms. Riggs attempted to discredit Ms. Rollings' testimony as to timing of the refinance, arguing that she began the process before September 17, 2004 and therefore could not have acted in reliance on there having been a settlement. Counsel also pointed out that a mortgage company representative or other witness did not appear to testify on this matter, despite the issuance of subpoenas for this purpose. Based on Ms. Riggs' own Exhibit 4, among other things, the Court finds that Ms. Rollings refinanced the Property on or about October 8, 2004.

Larson that the deadline for Ms. Riggs to move out and the deletion of the waiver of adequate protection payments were unacceptable changes, and that language would need to be added to specify that the additional release would be placed in escrow with his office until payment of the $35,000 was made in full.  *See* Plaintiff's Exhibit 9.

On November 29, 2004, Mr. Haeger and Mr. Larson spoke by telephone and agreed to the final terms set out in Mr. Haeger's November 24, 2004 response:

> "11/29/04:  T Haeger... Haeger called back this day.
> Told him we accept terms.  He will prepare agreement."

*See* Defendant's Exhibit 8 (Mr. Larson's note).

> "11/29/04: TC Jeff - changes ok. Draft language."

*See* Defendant's Exhibit 12 (Mr. Haeger's note).

At this point, based on Mr. Haeger's representations, Mr. Larson believed a settlement had been reached.  Ms. Rollings believed it.  On December 1, 2004, two days after both Mr. Haeger and Mr. Larson documented their last phone conversation, Ms. Rollings responded to the BBB.  She denied the allegations but stated that the "parties are close to resolution of the dispute between them."  *See* Plaintiff's Exhibit 10.  Even as late as December 16, 2004, Ms. Bette Buffington of Re/Max informed the BBB that the lawsuit between Ms. Riggs was in the process of being settled.  *See* Plaintiff's Exhibit 11.

Then, on December 27, 2004, Mr. Haeger sent a message to Mr. Larson stating that his client had withdrawn all previous offers, demanded turnover of the Property within the next 14 days and demanded payment of attorneys' fees in the amount of $12,000.00.

**II.     DISCUSSION**

The Court must decide the following questions, based on the evidence presented: (1) whether the parties entered into a contract to settle the pending litigation between them, (2) if a contract exists, whether it is enforceable, and (3) if the contract is enforceable, whether the Court should approve it under Rule 9019 of the Federal Rules Bankruptcy Procedure.

**A.     The Parties Entered into an Enforceable Contract**

Intent to make a contract may be inferred from the conduct of the parties. *Porter v. General Boiler Casting Co.*, 284 Md. 402, 409 (1979) (assent may be accomplished by acts as well as words). Even silence may constitute assent. *Id.* at 412. The true test is whether a reasonable person in the position of the parties think there is a contract. *Nat'l. Fire Ins. Co. of Hartford v. Tongue, Brooks & Co., Inc.*, 61 Md. App. 217, 225 (1985) ("Maryland, in short, applies the objective standard as to the formation of contracts.").

Agreements to settle litigation have long been favored in Maryland. *See David v. Warwell*, 86 Md. App. 306, 311 (1991) (federal and state courts have "looked with favor on the formulation of a policy encouraging the settlement of litigation issues," and citing other Maryland precedent back to 1843); *see also Mungin v. Calmar Steamship Corp.*, 342 F. Supp. 484 (D. Md. 1972) ("a settlement agreement enjoys great favor with the courts; consequently, it is only in the most extraordinary circumstances that such a pact will be vacated, for the general principle is that 'a settlement agreement... voluntarily entered into cannot be repudiated by either party and will be summarily enforced by the Court.'") (quoting *Cummins Diesel Michigan, Inc. v. The Falcon*, 305 F. 2d 721 (7th Cir. 1962)); *Beall v. Beall*, 291 Md. 224, 230 (1981) (forbearance to exercise a legitimate right or claim is sufficient consideration to support an

agreement).  Oral agreements to settle may be binding.  *The American Lighting Co. of Baltimore City v. McCuen*, 92 Md. 703, 706 (1901); *see also David*, 86 Md. App. at 306 (fact that a compromise was oral "'does not mitigate its effectiveness when a party acts in reliance upon it.'") (quoting *Billes v. Bailey*, 555 A. 2d 460, 462 (D.C. 1989)).

A party attacking a settlement agreement bears the burden of proof that the agreement made is invalid, either because it was fraudulently made or because both parties made a mistake. *Mungin*, 342 F. Supp. at 485 (citations omitted); *see also David*, 86 Md. App. at 317 (there is no such thing as half-settled; the court must implement a complete settlement or restore them to the status quo) (quoting *Wood v. Virginia Hauling Co.*, 528 F. 2d 423, 425-26 (4th Cir. 1975)). Therefore, when the existence of a settlement agreement is at issue, a plenary hearing is required. *David*, 86 Md.App. at 320.

The *David* case is instructive.  The Parties in *David* entered into a lease agreement and option to purchase real estate, which option was disputed and later became the subject of settlement negotiations and subsequent litigation.  The lessors sued the lessees as holdover tenants and the lessees sued the lessors for specific performance of the option to purchase.  The lessees then filed the motion to enforce settlement, arguing that the parties had settled and that an executed contract for the sale of the property was to be performed in order to effectuate the settlement.  *Id*. at 307.  Counsel for the lessors argued that his clients had decided not to settle and that a contract did not exist because it lacked certain material terms.  He further argued that even if a settlement agreement did exist, it was an oral contract to transfer land and therefore void under the Statute of Frauds.  *Id*. at 309.  The trial court found that a contract existed, but the appellate court reversed and remanded for two reasons: (1) the Statute of Frauds applied in the

case and therefore a written contract was required; and (2) no plenary hearing occurred, therefore, the lessees had not proven the existence of the settlement. *Id*. at 319 ("[t]he attorneys involved in the settlement negotiations were not called upon to give sworn testimony. At the most, the case was decided solely on the arguments of counsel").

In this case, Ms. Rollings argues that a binding agreement was reached outside the courtroom door on September 17, 2004, and that the only remaining task to be completed was the reduction of the agreement to a formal writing. Ms. Riggs urges that a binding agreement never existed because the parties never finalized certain material terms, including what parties would be released.[3] Ample evidence was presented by both sides to the Court at the August 5, 2005 hearing. Each party submitted exhibits and presented sworn testimony of the attorneys involved in the settlement negotiations. Therefore, the Court has had the benefit of a full evidentiary hearing on this matter.

The Statute of Frauds is not implicated in this case. The transfer of land was effectuated by a Deed executed by Ms. Riggs on December 5, 2003. Here, Ms. Riggs is attacking the existence of an agreement to settle the fraud suit she brought against Ms. Rollings, a settlement that would leave an existing Property transfer intact. The subject of the case as hand is the disputed settlement.

The Court finds that Ms. Riggs and Ms. Rollings entered into a settlement agreement, at the latest, on November 29, 2004, as established by notes made by both attorneys:

---

[3] Ms. Riggs argues at one point that in addition to the failure to agree about what parties were being released, that a binding agreement was never reached because the November Version deleted reference to the adequate protection payments and changed the move-out deadline. However, her main argument appears to be the release issue. See Response [19], ¶6 ("all the material terms that are necessary to invoke this Court's power to order specific performance are not present, since Riggs and Rollings never agreed on the parties to be released").

> "11/29/04:  T Haeger... Haeger called back this day.
> Told him we accept terms.  He will prepare agreement."

> "11/29/04: TC Jeff - changes ok. Draft language."

There may have been one or two final details to work out, but the Court finds that they were not so material as to hinder settlement.  The Court also finds that settlement was negotiated at arm's length by counsel and that each party had knowledge of all relevant facts at the time.  Ms. Riggs relied upon this settlement when she refinanced the outstanding debt on the Property, and she and her employer relied upon it as they responded to inquiries from the BBB.  A reasonable person in these circumstances would conclude that the parties had reached a binding agreement.  Mr. Haeger's testimony to the contrary is simply not credible.  The Court also rejects Mr. Haeger's testimony that he lacked authority to settle on his client's behalf.

### B.     Standard for Granting Settlement or Compromise

Federal Bankruptcy Rule 9019 provides that the Court may approve a compromise or settlement on motion by the trustee and after notice and a hearing.  Notice is to be given to all creditors, the debtor, the United States Trustee and to any other entity as the court may direct. Fed. R. Bankr. P. 9019(a).  Settlements are to be encouraged.  *U.S. v. Oncology Assoc., P.C. (In re Equimed, Inc.)*, 269 B.R. 139, 149 (D. Md. 2001) (citing *In re Smith,* 210 B.R. 689, 692 (Bankr. D. Md. 1997)).  The proponent of the settlement bears the burden of proof that the settlement is both reasonable and in the best interests of the estate.  *In re Frye*, 216 B.R. 166, 174 (Bankr. E.D. Va. 1997).

The bankruptcy court need not conduct a full evidentiary hearing on a motion for approval of compromise or settlement (although it did in this case given the context -- effort by one side to enforce a settlement).  *See, e.g., DePoister v. Mary M. Holloway Found.*, 36 F. 3d

582 (7th Cir. 1994); *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493 (Bankr. S.D.N.Y. 1991). The following factors are relevant in deciding whether or not to approve a settlement: (1) probability of success in litigation; (2) difficulties, if any, attendant to collection; (3) complexity of litigation, including expense, inconvenience and delay attendant to the litigation; and (4) paramount interest of creditors and proper deference to their reasonable views. *Id.* (citing *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc., v. Anderson*, 390 U.S. 414, 424, 88 S. Ct. 1157 (1968)). In making its decision, the court apprises itself of all facts necessary for an intelligent and objective opinion of the probable success should the claim be litigated. *Id.* The court also considers all other facts relevant to a full and fair assessment of the wisdom of the proposed settlement. *Id.* The essential inquiry is to determine whether the settlement reached by the parties is fair and equitable and in the best interests of the estate. *Id.* at 150 (citing *Drexel Burnham Lambert, Inc. v. Flight Transp. Corp. (In re Flight Transp. Corp. Sec. Litig.)*, 730 F. 2d 1128, 1135 (8th Cir. 1984)).

Ms. Riggs argues that this Court should not approve the settlement agreement because Ms. Rollings abused her confidential relationship with Ms. Riggs, a relationship that "resulted from the fact that Rollins is a realtor, and due to the 'Dear Homeowner' solicitation letter she sent to the Debtor on Re/Max stationary [sic]... that Rollings used her professional credentials as a realtor to establish a confidential relationship with the Debtor so she could prey on the Debtor's vulnerability and steal the substantial equity in her home." *See* Response [19] at ¶8. Ms. Riggs further "strongly suggests" that Ms. Rollings regularly misrepresents herself as a Re/Max agent in the flyers like the one sent to Ms. Riggs. However, Ms. Riggs does not provide any authority (either in her Response [19] or in the Objection (Complaint) [1]), and did not

demonstrate that a realtor owes some heightened duty of care that gives rise to a "confidential relationship" with a homeowner based solely on the fact that a realtor is a realtor, and did not demonstrate that even if it does, Ms. Rollings violated such relationship.

The Court is not convinced that the complaint states a sufficient cause of action for rescission of the Property transfer, or for the $1,000,000.00 in punitive damages requested, and the prospect for success is highly speculative. The Court is convinced that the settlement is in the best interests of creditors and the estate. The settlement brings to an end the uncertainty and expense that accompany litigation. With this issue resolved, Ms. Riggs will be better able to move on with her bankruptcy case to the benefit of the debtor and the estate. Enforcement and approval of the settlement are in the interested parties' best interests.

The Property value may now be high enough and the secured debt low enough to inure to Ms. Riggs' advantage, but the Property no longer belongs to her. With the benefit of hindsight, Ms. Riggs might have sought her counsel's advice before she asked Ms. Rollings for help. Perhaps he could have helped her save the Property from foreclosure without selling it.

For the foregoing reasons, the Motion of Ms. Rollings to Enforce and Approve Settlement Agreement [17] is granted. A separate Order will issue.

cc:    Robert J. Haeger, Esq.
       Morton A. Faller, Esq.
       Stephen A. Metz, Esq.
       Janet Mae Riggs, Debtor
       Karen Rollings, Defendant
       Office of the U.S. Trustee